## STATE vs. BENJAMIN DALTON.

### PROVIDENCE—MAY 2, 1900.

PRESENT: Matteson, C. J., Stiness, Tillinghast, Wilbur, Rogers, Douglas, and Dubois, JJ.

(1)   *Constitutional Law.   Trading-Stamps.   Lotteries.   Police Power.*

Pub. Laws R. I. cap. 652, provided that "it shall be unlawful for any person or corporation to sell, give, or distribute any stamp, coupon, or other device which shall entitle the purchaser of property to demand or receive from any person or corporation other than the vendor any article of merchandise other than that actually sold to said purchaser ; and for any person or corporation other than the vendor to deliver to any person any article of merchandise other than that actually sold upon presentation of any such stamp, coupon, or other device.   Provided, however, that this act shall not affect any existing contract ":—

*Held*, that the provision was unconstitutional because violating the fourteenth amendment to the constitution of the United States, which directs that no State shall " deprive any person of life, liberty, or property without due process of law," and Art. I, § 10 of the constitution of Rhode Island, directing that in all criminal prosecutions the accused shall not "be deprived of life, liberty, or property unless by the law of the land."

"Liberty," as used in the constitution, means the right not only of freedom from servitude, imprisonment, or restraint, but the right of one to use his faculties in all lawful ways and to pursue any lawful trade or avocation. This inalienable right is trenched upon and impaired whenever the legislature prohibits a man from carrying on his business in his own way, provided the business and the mode of carrying it on are not injurious to the public, and that it is not a business which is affected with a public use or interest.

It is within the constitutional right of an individual to sell his goods and as an inducement to people to trade with him to give to a purchaser directly or through a third party some other designated article of value as a premium. As neither the act in question nor the record before the court show that the precise nature and value of the premium were unknown to the purchaser, the transaction cannot in any sense be deemed a lottery.

The police power of the legislature must be so exercised as not to violate the constitutional rights of the people. It is not above the constitution, but is bounded by its provisions.

Quære, whether the legislature may not within the limitations imposed by the constitution prohibit the " trading-stamp " business.

COMPLAINT charging the defendant with giving "trading-stamps," so-called, in violation of cap. 652 of the Pub. Laws R. I. Certified to the Appellate Division upon the constitutionality of the act. Act declared to be unconstitutional.

TILLINGHAST, J. On the 13th day of November, 1899, the defendant was arraigned before the District Court of the Eighth Judicial District upon a complaint and warrant charging "that on the 28th day of October, 1899, with force and arms, Benjamin Dalton of Johnston, did sell to one Frederick W. Perkins certain articles of merchandise, to-wit: Three pieces of tobacco, and did then and there give and distribute to said Frederick W. Perkins three stamps commonly called trading-stamps, which said stamps did then and there entitle the said Frederick W. Perkins to demand and receive certain articles of merchandise from Sperry & Hutchinson, at their store, said Sperry & Hutchinson being persons other than the vendor of said three pieces of tobacco."

The defendant filed a motion that the complaint be quashed for the following reasons :

1. Because chapter 652 of the Public Laws of the State of Rhode Island, and especially the first section thereof on

which said complaint is founded, is in conflict with the first section of the fourteenth amendment to the constitution of the United States,[1] because it deprives the defendant of his liberty and property without due process of law. 2. Because said chapter further conflicts with the first section of the fourteenth amendment to the constitution of the United States, because it deprives the defendant of the equal protection of the laws in this : That stamps or coupons redeemable in money and merchandise, or property given by the vendor as a bonus, in addition to the article purchased, are not included within the prohibition of the chapter ; and, 3, because said act is in conflict with article 1, section 10, of the constitution of the State of Rhode Island.[2]

This motion was overruled by the court. The defendant thereupon pleaded "not guilty," but was adjudged probably guilty, whereupon the case was certified to this court upon the question of the constitutionality of the act under which said complaint was made. Said act reads as follows :

"Section 1. It shall be unlawful for any person or corporation to sell, give, or distribute any stamp, coupon, or other device which shall entitle the purchaser of property to demand or receive from any person or corporation other than the vendor any article of merchandise other than that actually sold to said purchaser ; and for any person or corporation other than the vendor to deliver to any person any article of merchandise other than that actually sold upon presentation of any such stamp, coupon, or other device. *Provided*, however, that this act shall not affect any existing contract.

"Section 2. Whoever shall violate any provision of this act shall be deemed guilty of a misdemeanor, and for each

---

[1] Art. XIV, § 1, of the amendments to the constitution of the United States : "No State . . . shall . . . deprive any person of life, liberty, or property without due process of law. . ."

[2] Art. I, § 10, constitution of Rhode Island : "In all criminal prosecutions, the accused . . . shall not . . . be deprived of life, liberty, or property unless by . . . the law of the land."

offence shall be punished by a fine of not less than one hundred dollars nor more than five hundred dollars, or by imprisonment for a term not exceeding three months."

It is contended on the part of the State that the act in question is sustainable as a valid exercise of the police power of the State, and also that the constitution of the United States does not limit the State in the exercise of such power.

It would be presumptuous for any court to attempt to formulate an exact definition of the term "the police power of the State." Legal definitions do not sum themselves up in single sentences. They are, and of necessity must be, more or less general and elastic in order that the courts may apply them to the infinite variety of circumstances which may arise in the relations and affairs of mankind in civilized society. But for all practical purposes the police power of the State may be shortly defined to be the power of the legislature to make such regulations relating to the personal and property rights as look to the public health, the public safety, and the public morals. In *Barbier* v. *Connolly*, 113 U. S. 27, it is referred to as the "power to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the State, develop its resources, and add to its wealth and prosperity." Further and more elaborate definitions may be found in *State* v. *Fitzpatrick*, 16 R. I. 54; *Harrington* v. *Board of Aldermen*, 20 R. I. 233; *Lawton* v. *Steele*, 152 U. S. 133; *Stone* v. *Mississippi*, 101 U. S. 818; *Com.* v. *Alger*, 7 Cush. 53.

Under these general and comprehensive definitions it is evident that the General Assembly is clothed with very large powers, and may exercise a broad discretion in the passage of laws pertaining to the internal affairs of the State. But while the power is large, it is not without limit, and, like all other powers of the General Assembly, must be so exercised as not to violate the constitutional rights of the people. In *People* v. *Gillson*, 109 N. Y. 389, the court, in referring to the police power, says that it " has never been fully described,

nor its extent plainly limited further, at least, than this: It is not above the constitution, but is bounded by its provisions; and if any liberty or franchise is expressly protected by any constitutional provision, it cannot be destroyed by any valid exercise by the legislature or the executive of the police power." See also *In re Jacobs*, 98 N. Y. 107; Guthrie on the Fourteenth Amendment, 76–89, and note by Prof. Thayer; *Stehmeyer* v. *City Council, &c.*, 53 S. C. 259. Again, when the validity of a statute of this sort is under consideration, it is always open to the court to consider, amongst other things, whether the act bears any reasonable relation to the public purpose sought to be accomplished; and a forced or strained relation is not enough. Thus in *Lawton* v. *Steele*, *supra*, Mr. Justice Brown, in delivering the opinion of the court, said: "To justify the State in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual or unnecessary restrictions upon lawful occupations. In other words, its determination as to what is a proper exercise of its police powers is not final or conclusive, but is subject to the supervision of the courts." (See *Kerr* v. *Ross*, 5 App. D. C. 249.) And then, after instancing various enactments which have been held not to be within the police power of the States, the court further says: "In all these cases the acts were held to be invalid as involving an unnecessary invasion of the rights of property, and a practical inhibition of certain occupations, harmless in themselves, and which might be carried on without detriment to the public interests." See also *YickWo* v. *Hopkins*, 118 U. S. 356; *People* v. *Marx*, 99 N. Y. 377. Of course, it is always to be presumed that all acts of the General Assembly are passed in the utmost good faith, and also that they are conformable

to the constitution. *Powell* v. *Pennsylvania,* 127 U. S. 678–685. And it is not until the unconstitutionality of a given act is *plainly* made to appear that the court is called upon to declare it void. *State* v. *Dist. of Narragansett,* 16 R. I. 424; *Carr* v. *Brown,* 20 R. I. 215. But after indulging every possible presumption and intendment in favor of the validity of a statute, and being unable to find that it can be sustained as a constitutional exercise of the legislative power, it becomes the duty of the court to declare it void. *Taylor* v. *Place,* 4 R. I. 324; *Carr* v. *Brown,* 20 R. I. 223; *Mugler* v. *Kansas,* 123 U. S. 661; *Minnesota* v. *Barber,* 136 U. S. 313.

We come, then, to the question whether the act before us is one which falls within the police power of the legislature; for, if it is not, it is clearly an unlawful interference with private right. We will endeavor to test this question by the simple process of elimination.

First, then, does said act look to or in any manner concern the public health? No one claims that it does, and no one could for a moment claim, with any basis of reason, that it has or was intended to have even the remotest bearing thereon.

Second, does the act look to or tend to promote the public safety? Nothing of this sort either is claimed in its favor, and we fail to see that anything could be, for it bears no relation whatsoever thereto.

Having thus eliminated two of the general grounds upon which said act must be supported as being a valid exercise of the police power, we come to the third and last one, which raises the question whether the act relates to or tends to promote the public morals. The counsel in behalf of the State vigorously contends that it does, on the ground that it prohibits schemes which are in the nature of a lottery or gift enterprise, and hence, whether technically a lottery or not, are open to the same objection. He argues, substantially, that it is the element of chance, the hope of getting something for nothing, and the appeal to the gambling instinct that constitutes the evil of lottery transactions; that it is

clear that the scheme contemplated by the act and prohibited therein is in effect a lottery; and that, as an inducement to purchase, the promise of a premium to be given by a third person is held out and the precise nature of the premium and its value are unknown at the time of purchasing; and thus a subtle appeal is made to the gambling instinct; and, moreover, that a demoralizing element is introduced into legitimate business.

If this contention is well-founded, the act in question is undoubtedly a valid and legitimate exercise of the police power. Is the method of doing business which is prohibited by the act, then, in the nature of a lottery? A lottery is a scheme for the distribution of prizes by chance. *Governors of Almshouse* v. *Art Union*, 7 N. Y. 228; *Thomas* v. *The People*, 59 Ill. 160. Or, to state it with more fullness, "it is a scheme by which a result is reached by some action or means taken, in which result man's choice or will has no part; and which human reason, foresight, sagacity, or design cannot enable him to know or determine until the same has been accomplished." 2 Bouvier, 281; *People* v. *Elliott*, 74 Mich. 264. The word *lottery* "embraces the elements of procuring, through lot or chance, by the investment of a sum of money or something of value, some greater amount of money or thing of greater value." *United States* v. *Wallis*, 58 Fed. Rep. 942.

The method of doing business which the act prohibits is the giving by the vendor, in connection with the sale by him, of any article or articles, of any stamp or other device which shall entitle the vendee to obtain from some other person some article of merchandise in addition to that actually sold.

It is to be observed that the act does not prohibit the vendor himself from giving or "throwing in," as it is sometimes termed in common parlance, some other article in addition to that sold, but only prohibits the seller from giving anything in the nature of a check or order upon some other person which shall entitle the holder thereof to obtain from such other person some article of merchandise in addition to the thing sold.

In other words, the act recognizes the right of a person to give away an article of merchandise in connection with, and as an inducement to, the making of a sale of some other article, but provides in effect that the giving of such additional article must be done by him directly and not through a third person. We fail to see that there is any substantial difference in principle between the two methods, or that either bears any resemblance to a lottery. The element of chance, which is the basal principle of every scheme in the nature of a lottery, is wholly wanting. To illustrate : A. buys of B. twenty pounds of sugar for a dollar, and is given with the purchase an order, check, stamp, token, or some kind of device—no matter what—which upon presentation to C. entitles A. to some other specific article of merchandise in addition to the sugar. How does such a transaction differ in principle from one where A. receives the premium for making the purchase —for such it really is—directly from B. himself? In other words, how is it changed into a gambling transaction by the fact that the premium is received through the agency of C. instead of being received directly from B.? We cannot see that it is thus changed. The thing sought to be accomplished by the vendor is the sale of his goods by means of the inducement held out to the purchaser in the form of a premium ; and if he may himself give and deliver the premium, as he clearly may, he may also give it through a third person.

As to the argument before referred to, that the scheme is in the nature of a lottery because the precise nature and value of the premium are unknown to the purchaser, it is enough to reply that nothing appears in the act or in the record before us to show this. The prohibition is that the purchaser shall not receive from any person other than the vendor "any article of merchandise other than that actually sold to said purchaser," thereby implying that the parties to the transaction would be dealing with reference to some particular article, or at any rate to some one of a given class of articles, in the possession of the third person, the nature and value of which were well understood.

To illustrate again : A. buys of B. a suit of clothes for $20, and receives a check or stamp which entitles him to receive from C. a pair of shoes worth $2, a hat worth $2, or a pair of gloves worth $2. It is true that A. has not seen these articles at the time of purchasing the clothes, but as he knows that he is to receive one of the articles mentioned, as he may elect, we cannot see that there is anything so uncertain about the transaction as to appeal to the gambling instinct. At any rate it does not in any real sense partake of the nature of a lottery. It is simply one of the infinite variety of devices which are resorted to by tradespeople in these days of sharp competition to promote the sale of their goods.

The complaint in the case before us expressly sets out that the stamps which were given by the defendant, in connection with the sale, entitled Perkins, the purchaser of the tobacco, to receive "*certain articles of merchandise from Sperry & Hutchinson at their store*," thereby showing by a fair inference, we think, that it was well understood between the parties to the transaction what the articles were.

It is to be further observed that the act does not prohibit the sale of merchandise and the giving in connection with and as an inducement to the purchase thereof of trading-stamps redeemable in cash by a third person, nor does it prohibit the giving of stamps redeemable by the vendor himself either in cash or merchandise; so that the use of trading-stamps is not prohibited, but only limited. And it would seem that the legislature could not have considered the scheme which the act prohibits as being in the nature of a lottery, for if they had they would not have exempted the cash-stamp business from the operation of the law.

Referring again to the act in question, our view thereof may be stated thus : The act, as we construe it, prohibits a person from selling a given article, and at the same time and as a part of the transaction giving to the purchaser a stamp, coupon, or other device which will entitle him to receive from some third person some other well-defined article in addition to the one sold. This is equivalent to declaring

that it is illegal for a man to give away one article as a premium to the buyer for having purchased another. For, as already intimated, it can make no possible difference that the article given away with the sale is delivered to the purchaser by a third person instead of the seller himself. We think it is clear that such a prohibition is an unwarranted interference with the individual liberty which is guaranteed to every citizen, both by our State constitution and also by the fourteenth amendment to the constitution of the United States. The term "liberty," as used in the constitution, is a very broad and comprehensive one. It does not mean freedom from physical restraint simply, but embraces the right of each individual "to be free in the enjoyment of the faculties with which he has been endowed by his Creator, subject only to such restraints as are necessary for the common welfare." In the terse language of Peckham, J., in *People* v. *Gillson*, 109 N. Y. 399, "Liberty, in its broad sense, as understood in this country, means the right not only of freedom from servitude, imprisonment, or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or avocation." See also *Frorer* v. *People*, 141 Ill. 171; *Allgeyer* v. *Louisiana*, 165 U. S. 589–90; Guthrie, *supra*, 109. This inalienable right is trenched upon and impaired whenever the legislature prohibits a man from carrying on his business in his own way, provided always, of course, that the business and the mode of carrying it on are not injurious to the public, and provided, also, that it is not a business which is affected with a public use or interest. Now it was certainly within the constitutional right of the defendant in this case to sell tobacco—it being presumed, of course, that he had obtained the necessary authority to deal in that article—and, as an inducement to people to trade with him, it was also his right to give to each purchaser of a certain quantity of tobacco, either directly or through a third person, some other designated article of value by way of premium. The statute in question, however, steps in to prevent him

from adopting such a course to procure trade, and from it to secure an income and livelihood ; and he is thus restrained in the free enjoyment of his faculties to which he is constitutionally entitled, unless such restraint is necessary for the common welfare in one of the ways heretofore mentioned, and we cannot see that it is. In other words, the statute says that A. shall not sell to B. a barrel of flour and, in connection with and as a part of the contract of sale, give to B. a coupon which will entitle him to receive from C. a pound of tea, a pitcher, a lamp, a clock, a door-mat, or some other specified article of merchandise. If the act had prohibited the giving away of any stamp or device, in connection with the sale of an article, which would entitle the holder to receive, either directly from the vendor or indirectly through another person, some indefinite and undescribed article, the nature and value of which were unknown to the purchaser, there would then be introduced into the prohibited transaction enough of the element of uncertainty and chance to condemn it as being in the nature of a lottery.

But it is further argued in support of the statute that the scheme aimed at is one which is demoralizing to legitimate business, and hence within the police power of the State to prohibit. Just what is meant by this general characterization of the scheme is not clear. If, however, as we presume, the language is intended to refer to the methods employed by trading-stamp companies .in their dealings with merchants, as revealed in the Lansburgh case, *supra,* it is simply another way of saying that the scheme is a gift enterprise, partaking of the nature of a lottery, and hence may be prohibited by the State. But, as already intimated, we fail to see that, even conceding that the scheme which is sought to be prohibited may properly be denominated a gift enterprise, it partakes of the nature of a lottery, and hence is demoralizing to legitimate business in the sense of being a scheme to cheat and defraud purchasers. In other words, a gift enterprise is not necessarily a lottery. *Long* v. *State,* 74 Md. 565.

In this connection it is pertinent to observe that it is not

enough to warrant the State in absolutely prohibiting a given business, that it is conducted by methods which do not meet with general approval. There must be something in the methods employed which renders it injurious to the public in some one of the ways before mentioned, in order to warrant the State in interfering therewith. Nor is it enough to bring a given business within the prohibitory power of the State that it is so conducted as to seriously interfere with or even destroy the business of others. Take, for illustration, the great department stores in our large cities. By reason of the almost infinite variety of goods which they carry they furnish greater facilities to customers, and can offer them greater inducements in the way of trade than can those stores which carry but a single line of goods. The result is, as everybody knows, that very many small traders have been crushed out and obliged to abandon their business entirely, while the owners of the mammoth establishments which supply almost everything which we eat, drink, wear, use, need, or desire, whether useful or ornamental, are prosperous and successful in a remarkable degree. But while the result of this method of doing business is injurious to those who employ the more primitive one, can it be said that a law prohibiting a department store would be a valid exercise of the police power? Clearly not. A case decided no longer than December last holds that such a law is invalid. We refer to the case of *Chicago* v. *Netcher*, 55 N. E. 707, in which it was held that an ordinance prohibiting a person, firm, or corporation from exposing for sale or selling any meat, fish, butter, or other provisions in any place of business in the city where dry-goods, clothing, or drugs are sold tends in no way to protect the safety, health, or morals of the public, or to accomplish an object falling within the police power. It was also held that such an ordinance contravenes the provisions of both the constitution of the United States and of the State insuring to every person liberty and the protection of his property rights, and providing that he shall not be deprived of life, liberty, or property without due

process of law.  In *State* v. *Ashbrook*, 55 S. W. 627, decided
in February last, the Supreme Court of Missouri strongly
condemns legislation which attempts to abridge or hamper
the right of a citizen to pursue any lawful calling or avoca-
tion which he may choose without unreasonable regulation
or molestation.

It may be demoralizing to legitimate business for two great
rival dry-goods houses to cut prices in the attempt to under-
sell each other, or for two competing railway lines to sell
tickets at half price in the attempt of each to get an advan-
tage over the other ; yet probably no one would claim that
such competition could be prohibited by law.    "Bargain
sales " and " bargain counters " may be demoralizing to busi-
ness, but probably no one would claim that they can be abol-
ished by law.

The invention of labor-saving machinery may be said to
demoralize business, and so may numerous other modern in-
novations in manufacturing and industrial pursuits whereby
old methods have to be abandoned and new ones adopted.
But whatever demoralization results therefrom is incidental
to that principle of evolution which is everywhere manifest
in the mercantile and industrial as well as in the physical
world.    The great law of competition invites and promotes
this sort of demoralization, and the remedy for one who is
injured by it lies not in legislation, but in being able to keep
pace with the changed, if not always improved, methods.

But it is further argued that the fact that a given scheme
has an element of certainty does not operate to purge it of
its taint as a lottery where the element of chance is present.
And in support of this contention several cases are relied on,
to which we will briefly refer.    *Dunn* v. *The People*, 40 Ill.
465, is widely different from the case at bar.    There the evi-
dence showed that the defendant, who was indicted under a
statute making the vending of lottery tickets a penal offence,
was conducting what he termed a " gift-sale " establishment ;
that he kept upon his desk a box filled with envelopes, upon
each of which was printed an advertisement purporting that

it contained valuable recipes and popular songs, and also a card descriptive of some article in an "immense stock of over 250,000 pianos, watches, sewing-machines, jewelry, etc., worth $1,500,000. All to be sold for one dollar each, without regard to value, and not to be paid for until you know what you are to receive." An advertisement was displayed at the store which gave a list of a great variety of articles, and stated that some of them were represented by the card in the envelope. A card might represent a grand piano or a finger-ring, but whatever article the purchaser might find specified upon the card in the envelope bought by him he would be entitled to purchase for one dollar. The price of the envelope was twenty-five cents. It was strenuously argued by counsel for the plaintiff in error that the sale of one of these envelopes with its contents was not the sale of a lottery ticket, because there was no element of chance in the transaction ; that the card or ticket representing an article of merchandise to be bought for one dollar conferred simply a right to buy, which the holder could exercise or not at his option, and that if he bought he did so with his eyes open and with the opportunity of knowing the value of what he purchased. But the court held that while the element of chance did not lie in what the holder of the envelope might knowingly do with his card after he had purchased the envelope, it did lie in the purchase of the envelope itself, which, it was represented by the advertisement, might contain a ticket that would give him the right to buy for a dollar an article worth hundreds of dollars, or it might contain one which would only give him the right to buy something so valueless as not to be worth buying at any price. Such a scheme was very clearly a lottery within any of the definitions hereinbefore given. *Horner* v. *United States*, 147 U. S. 449, was also a case in which the element of certainty went hand in hand with the element of chance, and the court held that the former did not destroy the existence or effect of the latter. *Taylor* v. *Smetton*, 11 Q. B. 207, was a case where the defendant sold packets, each containing a pound of tea,

at 2s. 6d. a packet. In each packet was a coupon entitling the purchaser to a prize, and this was publicly stated by the defendant before the sale, but the purchasers did not know until after the sale what prizes they were entitled to, and the prizes varied in character and value. It was held that the transaction amounted to a lottery under the Stat. of Geo. 3, c. 119, § 2. In that case it clearly appears that the purchaser bought the tea coupled with the chance of getting something of value by way of a prize, but without any knowledge of what the prize might be. "In making his purchase," as said by the court, "he exercised no choice; what he got he got without any option or action of his own will, but as the result of mere chance or accident." In *Reg.* v. *Harris*, 10 Cox. Crim. Law Cases, 352, the element of chance was manifestly present. In *State* v. *Lumsden*, 89 N. C. 572, the defendant sold to customers small boxes of candy of trifling value for the chance or opportunity of designating one of certain pictures, conveniently arranged in his place of business, behind some of which were small sums of money and behind others a card on which was the title " C," the purchaser getting either the money or the card, accordingly as he might select; but if he got a card he became entitled to another box of candy. This was held, as undoubtedly it should have been, to constitute a lottery. *Lynch* v. *Rosenthal*, 144 Ind. 86, and *Davenport* v. *Ottawa*, 54 Kan. 711, are cases where the element of chance is so manifestly present and controlling as to require no comment. *Lansburgh* v. *Dist. of Columbia*, 11 App. Cases D. C. 512, is more nearly in point than any of the others relied on in support of the act, but is not controlling. The statute under which that case was brought prohibited any gift enterprise in the District, and the court held that dealing in trading-stamps in the manner shown by the evidence brought the acts of the defendant within the statutory definition of a gift enterprise. The court suggested, however, that it was possible that the statute might not be operative in a case where the sale of a lawful article was accompanied by a gift of something specific and

certain, not attended with any element of chance, and where the gift was not the real object of the sale, in an attempt to evade acts regulating or prohibiting a particular traffic. In so far as the opinion, which is a very vigorous one, condemns the trading-stamp business it describes, we are not disposed to differ therefrom. *Humes* v. *City of Fort Smith*, 93 Fed. Rep. 857, holds that the State may provide that gift enterprises shall be licensed, or may, under the police power, prohibit them altogether. The case is similar to and follows the *Lansburgh* case, *supra.*

Amongst the cases to which we have been referred by defendant's counsel as supporting their contention that the transaction prohibited by the act is not in the nature of a lottery, those of *People* v. *Gillson*, 109 N. Y. 389 ; *Ex Parte McKenna*, 58 Pacific Rep. 916 ; and *Long* v. *State*, 74 Md. 565, are most nearly in point, and on principle sustain the position we have taken.

Having thus come to the conclusion that the act cannot be sustained as being a valid exercise of the police power, it becomes unnecessary to consider the other point taken by the defendant, namely, that the act is obnoxious to the fourteenth amendment, as being class legislation.

In order that we may not be misunderstood in the position which we feel compelled to take regarding the case before us, we deem it proper to say that we do not approve of the trading-stamp business as some of the cases above referred to inform us it is conducted, although there is no evidence before us concerning it, nor do we decide that it is not competent for the General Assembly to prohibit it. What we do decide is that the statute in question is so broad as to interfere with the right of an individual to deal with his own property in his own way ; that is to say, to make such contracts regarding the sale and disposition thereof as he shall see fit, so long as he observes the rule that each one shall so use and enjoy his own property as not to injure that of another person, and also the further rule that his use of it

shall not be injurious to the community ; and hence is not a valid exercise of the legislative power.

*Alexander L. Churchill*, for the State.

*Tillinghast & Murdock*, for defendant.